Good morning, Your Honor. May it please the Court, many of the issues with regard to the conviction, even if the Court does not agree with me on the sufficiency of the evidence, may relate back to the sufficiency of the evidence. I wanted to address briefly why I think that this case is substantially different from some of the other fraud cases the Court sees. First, you take that the government in its brief has conceded that they did not prove as to any victim or as to any, even a single drink purchase, that it was fraudulent in this case. Not a single purchase of a single glass of champagne was proven to be fraudulent. Now the government has instead put forth, they put on a witness, a member of a, a former member of a Russian mafia who had made various agreements over the years with the government and whose testimony changed tremendously from the first trial to the second trial, to make certain assertions regarding his conclusions about generalities of practices. But again, when you look at the record and try to pin those things down, even to a particular club, much less to a particular event that Mr. Feldman, my client, could have seen, observed, or participated in, it is very, very difficult. And so what, what you have then is, what is, what else is there besides this vague testimony by a witness who quite honestly should have testified with an interpreter because the answers are, are, don't match the questions in, in, from a linguistic sense. What you have- So is your, is your point, just so I understand, the testimony, for instance, from Simchuk that, you know, did customers, were they charged for bottles they didn't order? Yes. Did it happen? No. Yes. That's just not enough. The testimony doesn't actually read that way. The testimony, what it, what it, what it reads is that, did it happen? When the question was asked, did it happen? It, it, it is my understanding of that testimony, he's asking, I think he's actually talking about did it happen in his bars in Eastern Europe, when the question is asked. Then, then the question is asked, was Feldman aware of that? And then the answer is, yes, he did, or something like that. So maybe, maybe my notes are wrong. I'm looking at 1488 at 115 to 116. Would the customer's card be charged for bottles he didn't order? Yes. Did this happen at Star's Lounge? Yes. Did you talk to Feldman about this? Yes. What did you tell him? I told him exactly how it works. In the beginning, when we met, I told him exactly how it works. No, that's, that's the ellipses version in the government's brief. In other words, if you look at the government's brief, there's ellipses at various portions of that and you, you can grasp out words like that. But when you look at it in context, he's not even really, you can see from the first question, he's not talking about Star's. You can see from the second question is, did it happen? Did it happen once? Did it happen twice? And was he aware of that? Was he aware of that question? We don't know whether that relates to Star's or whether that relates to some other bar. He, he, he was asked, as Judge Newsom just pointed out, whether this happened at Star's and, and said yes. I understand that. But, but he, the problem is, did it happen ever at Star's? This is a conspiracy to commit fraud. And we're talking about, do you have a conclusion in your mind that at some unknown time, one or more times this occurred at Star's? And that's the core of their case. In other words, when they reach for something to prove this case, they reach for something that doesn't prove a conspiracy. It proves maybe something happened one time at this bar, which again, they never proved. They simply proved a generic recollection. Did this happen at Star's? Did, did, did Feldman ever observe it? When the, the answer, what did you, when he asks him, what did you discuss with Feldman? The follow-up to that is, he goes back to pre-investment discussions. In other words, when he asked him, did you actually discuss with him, I saw this occur at Star's? It's not in the record because it never happened. Well, the real question is, um, whether they had an agreement that this is how it would work, isn't it? That's, that's the essence of the conspiracy, right? It is. And then when the question is, when he tells him, this is how it works, he again has a long paragraph, none of which is about people paying for bottles that they didn't order. Because the whole premise of this bar, and when Simchuk is asked again about forgeries, that was original, we thought we might, that they thought they might face forgeries. When he's asked about forgeries, he says, of course forgeries is not part of this. What do I need forgeries for? I need, well, I don't need people to forge. I need people buying drinks. And that's the whole thing. This thing about unauthorized charges, you're just inviting somebody to say, I didn't order five bottles, I ordered four bottles. But you agree with me that we, we need to look then at the context of that testimony and read all of it, right? You have to look at it every, that's so important with the sufficiency and, and. I, I'm only trying to move on to something else that troubled me, and that is the sentencing enhancement about number of victims. Do you want to say anything about that? Because I'm going to ask. It's, it's directly related to my first point. At sentencing, they, they go forward and again, they don't prove any loss at sentencing. What do they prove? That some customers made, some customers, what, you know, do they, it's not as if they did not, were not able to bring in customers. They called customers at the first trial, and Mr. Feldman was acquitted of every single customer who testified at the first trial. So they decided, we better not call any more customers at the second trial. I mean, I guess, but they don't call any customers at the sentencing either. All you've got is people who complained about their bills and their money was returned. And that is not proving fraud. And again, it's complaining about the bill, the entire bill for these people, each person, the entire bill is complained about. Not, oh, you didn't order bottle six, or you didn't order bottle five. Everything about this case, the context for insufficiency argument is what else is there? There's a police officer in the bar. Who brings the police officer in? Mr. Feldman. Is he on the take? No. Is he getting bribes? No. Is he legit? Yes. What else is in the bar? Security cameras. Who brings the security cameras in? Mr. Feldman. What does Mr. Simchuk complain about Mr. Feldman? He's bringing in girls who don't know how I do business. I had to go to somebody else to stop him from bringing in girls who don't know how I do business. Mr. Feldman is a nuisance. You cannot join a conspiracy by being a nuisance. And the vague allusions, they don't add up. King, the police officer, is here every night. He never, ever says one thing about fraud to Feldman daily. When they do talk about anything criminal, Feldman says, no, we cannot cross any red lines. And that applies to the victims, and the loss, and everything else about the case. So I'm responsible for having sent all of you those questions, and then the follow-up authorities. You haven't talked about the double jeopardy issue, but it did seem to me that the more I looked at it, that there's not a double jeopardy problem. Do you acknowledge that? Because it was charged as a single offense and alternate theories, that looks like that's the way the case law would distinguish this situation from cases like Green and Price. Well, I spent a lot of time going over all of those cases, and I think it was obviously helpful to me. And what I divine from them is that there is a body of law that says, if you have alternate theories, like you get murder by felony murder, murder by premeditated murder, it's the same offense. You're convicted of the same thing. Murder. You can only be convicted of murder once. Right, exactly. First degree murder. But this is not that context. This is charging, this is to avoid a duplicity objection, you put two conspiracies in one count. That's basically what it is. And the question is, is it a greater or lesser, I mean, as a theoretical matter, and I think we went on the theoretical matter before you even get to the actual hard facts of the procedure in this case. Of course, is there some punishment additional if the person is convicted of concealment? Well, we know there's both a sentencing impact as well as an impact on the case, because the money laundering shouldn't even be in the money laundering statute, because it's not laundering money. International promotion laundering is clean money, and it really is just thrown into the money laundering statute. What the government frequently does, they frequently have a 1956 count and a 1957 count, and in rare cases... But the count here is a conspiracy count. It's a conspiracy to commit money laundering. When you look at the indictment, that's what it's charged as, it's a single conspiracy, and alternate theories for that single offense, right? But it's really more like the case, it's a conspiracy to commit burglary and robbery in the same thing. They're fundamentally different underlying offenses. It's not like a conspiracy to commit burglary by trespass, and then a conspiracy to commit burglary by entry. It's two fundamentally different offenses that have different components. If you're convicted of the dirty money part of the count, the count that we were not convicted of the first part, you're subject to additional forfeiture penalties, for example, and I noticed the court cited the Ham case, and I think even though that case, it was only the forfeiture issue, the fact is that you have additional penalties. There's the enhancement, the sentencing enhancement that plays only because of the concealment provision, and there's the effect on the rest of the case. If you convict on the concealment, then you are essentially convicting on the rest of the case. Okay. Thank you, Mr. Kluge. You've saved five minutes for a rebuttal. Mr. Shipman. Good morning, Your Honor. Just for the record with me, at counsel table is Mike Thakur, who was one of the trial lawyers in the case, along with Dick Gregory, who tried the case as well, who has since retired from the office. In its opinion, reversing in the Tack Law of one opinion, the panel, other than the one jury instruction issue on the theory of defense, stated the district court had done a nearly flawless job in all of its legal and evidentiary rulings, and I would suggest that is an accurate description of what happened at the second trial. Let me go first to the issue of sufficiency. Judge Pryor, as you're mentioning, there is, I encourage the court to look at the record not only of Simchuk's testimony, but of other individuals as well. In addition to the citation that Your Honor quoted, which is only one of those instances, we have Mr. Simchuk having testified specifically about Feldman, 1489, page 110, the main scheme was lying to the customers once they were inside the club to make them drunk so they wouldn't see what was being charged and the bottles they had not ordered they were being charged for. Feldman was aware of this, we discussed it, and we also discussed how to avoid charge backs. Other citations, 1488, 129, Simchuk told Feldman he was running the business, representing him in Miami, having told him that he's a criminal, and specifically having asked Feldman when Feldman came to him initially, why do you want this? Why do you want to do anything with me? You know I'm a criminal, you know about my reputation, and in fact what the record shows is that's exactly why Feldman went to him. Feldman knew what was going on at Caviar Bar, which is what Feldman, I'm sorry, Simchuk was running at the time. He knew what had been done in Eastern Europe, and that's exactly what he was hoping would give him an avenue to profits. The testimony... What is there other than Simchuk's testimony? Absolutely Judge, happy to walk through it. You have two other witnesses at least who specifically testified about Feldman's knowledge, even aside from the circumstantial evidence. You have Turchina, who was one of the bar girls, that's at 1487, 189, and 1488, 31, talking about how Feldman was present at the meetings they had after each night where they would discuss whatever happened at the club that night. So a claim that... Okay, so they discussed whatever happened at the club that night. Right. What did she say that would suggest that what they discussed evidenced this conspiracy? Well, I think the entirety of her testimony was about the practices that would go on in those clubs, including the pouring out of drinks and the overcharging. I don't think in that snippet of testimony she specifically, we talked about these activities, but I think when you read her testimony, that's clearly what the jury took from it. You also had Officer King, who testified, this is at 1491, page 75. Feldman was very much... Feldman was much aware of what was going on in the club, what was occurring at the club. And again... Did he confirm that what was happening was overcharging of customers? Or fraudulent charging of customers? Sure. I mean, King is actually the one in Starr's Lounge this whole time. So he's there as the undercover. So he's all the things that the B-girls testified to, the three who testified at trial, were corroborated by King. We also had the video and audio testimony as well of some of these instances. And I think it's important to clarify, because Mr. Brieff, this idea that there were no actual victims, the government, through King's testimony, through the B-girls, established specific individuals in specific circumstances who were charged fraudulently, were charged for things they didn't order, who had items they were charged for that were then stolen back from them. There's one incident where somebody is literally drunken, falling out of the bar, and a girl charges him for a bottle of champagne and then takes it back as he's being pushed off into a cab. And also, what I think about the number of victims enhancement. So we're just doing from the complaints by the customers that all of those who are fraudulent, that seemed to be a stretch to me. I don't think that's ultimately where the government came out in this sentencing. I mean, it was certainly the government's theory, as it had been at the first sentencing, that look, everybody who went in there was a victim of fraud. Not merely from the initial misrepresentation about the relationship between the girls and the bar, but every customer was defrauded inside the clubs in exactly the same way. So that was the government's theory. That's not the theory of the enhancement, though. Right. I understand. I'm just trying to lay the foundation for where the government came in its numbers. At the second sentencing, what we did was put together a chart. We stood by that theory that said we are to avoid any possible conflict with what had come out of it. What we did was prepare. It was Exhibit A to the government's sentencing memo. I'm not sure if it's actually in the record or not. If not, I'm happy to put it in the record. But it listed specifically, it was provided to defense counsel, listed specifically by exhibit number, by individual, the chargeback documents that were found in that purple binder, one of the binders, in Feldman's own office. So there were links to the number of victims. It wasn't just an abstract infer there were more than 10 people. It was linked to specific complaints of fraud. And when you look at those documents in the chargeback binder, they're not some abstract. Obviously a bank could charge back a transaction for any variety of reasons. But these customers made specific complaints of fraud. They said they were defrauded. I was charged for things I did not order. Things that I did not authorize were put through, and that's why I'm seeking reversal of these. You see those in the chargeback binders which were contained in Mr. Feldman's office. So it was not an abstract, it wasn't purely an inference that there were more than 10 people in the club, and they were all defrauded, so that's how you get more than 10. There are specific victims of which there were far more than 10 identified on this exhibit. And really there was no, you read the sentencing record, there was no drilling down on that. There was no dispute about the amount. There was no dispute about whether it was 10 more or less. I think the only defense argument was... Yes. Absolutely. You see that from the documents in the chargeback binders, and you see that specifically listed in the exhibit that was provided at sentencing. And relatedly as to intended loss, I mean I guess the two sort of travel together, but relatedly as to intended loss, there'll be enough in the record to show that the entirety of the disputed charge was fraudulent, such that it could be attributed to Feldman's intent? Right. Yes, I think you have that same document again working off of customers who actually, again, the government narrowed the universe from its broader argument, which I still think is a valid argument, that for intended loss purposes, which focuses on what the defendant's intent was, you have enough that everybody who came through there was intended to be a victim of fraud. And you can look at the entirety of their expenses. In the chargeback documents, however, which is all the government used for its sentencing number, which is why it went down from the, after the first trial to the second trial, we only looked at individuals who we could document as having taken the step of making a complaint to their card company saying, I was defrauded at this place, in one form or another. Some refer explicitly to the word fraud. Some say it was unauthorized. I guess the reason I wonder is that I'm assuming like if I call, if I, you know, not that this is really my style, but if I spend six hours at a club on South Beach and, you know, walk out of there with, you know, a $10,000 tab, call Amex the next morning, kind of shake it off, call Amex the next morning and say, I dispute the $10,000, it may well be that the first $2,000 was on me, and the next $8,000 was on the B-girls. So if I dispute the full $10,000, can you really attribute the first two to Feldman? That's my question. You know, again, hold aside the broader issue. I mean, we're stepping away from the larger argument, which is that all of this, this was all a fraud operation. So, yes, you do count that initial $2,000. I don't think you had any dispute about that at the sentencing hearing. If that were an avenue that somebody was going to pursue, they could have done that. They could have taken, gone back through these chargeback documents, tried to develop some kind of argument to bring the loss figure down. I don't know at the end of the day whether even if you take out those first portions, for example, whether you get to a lower category of loss, because this issue wasn't framed this way. This is a general issue of you didn't call any actual victims, and therefore the loss should be zero. There wasn't a more targeted, more focused approach. So I understand that's a reasonable discussion topic, but it's not one that reflects the record in this case or the advocacy that was made about it. And I would stand, again, on the argument that even in general, even in your scenario, this is a fraud scheme. Intended loss, we're simply trying to get a reasonable estimate of the loss by preponderance standard, and you certainly have that just based on what the government submitted. On the double jeopardy issue, could the government have charged this as two offenses? On the money laundering? You know, I think, as Mr. Kluge acknowledged, what we face in some of these charging decisions is a potential duplicity type argument. And so we tend to do these, even though I agree with them, they really are, promotion money laundering really is a creature by itself, in some ways, from what we classically conceive of as money laundering in the sense of taking during- But the charge is the conspiracy. Right. In terms of a money laundering conspiracy, and these are the two objects of it. So could it have been broken out? Possibly, but I think you would have been met with some arguments about duplicity, and I think the general practice is to treat them as two objects of a conspiracy. And even on a substantive count, you might be able to- In the government's view, there was one agreement, two launder money, in two different ways. Well, they were two objects of the conspiracy, right. It was a multi-object conspiracy. The district court instructed the jury. It could find either of them, and the jury- The way you argued and proved it was that everyone who agreed to the first object, it was the same exact individuals who were agreeing to the second object? Yes, Judge, that it was the same. These were the same ambit of people, the same participants who created these. They really involved distinct conduct. They involved the same participants. The concealment piece dealt with primarily the creation of IEVA Marketing and the Jolita Marketing, these sort of sham marketing companies that took the money from the Stars Lounge bank account and then dispersed it back in cash to the girls. Promotion dealt with a number of higher transfers that went both from the international investors who were Simchuk's cohorts and also the outgoing share of the profits. But it was the same participants. There's no issue of a divergence between who was involved in these different activities. If the court has no- I'm happy to address any further questions the court may have in this substance, but I wanted to, with the court's indulgence, address a matter that was not raised by Mr. Kluge. I know it's not the practice of this court to address matters that are not raised in opening briefs. That's your option because then he'll get an opportunity to address it for the first time in rebuttal and you won't have anything to say about it. Well, I think that's fine, Judge, because it calls out for it. The accusations that are made and the language that appears in Mr. Houlihan's brief, and especially his reply brief, is outrageous. And we hold prosecutors, I think rightly, to a high standard of advocacy. You expect- this court expects us to make arguments that are rooted in the record, that have a good faith basis, and are not founded on innuendo and slander. And I think it's appropriate to apply that standard to advocacy and offense lawyers' brief. The allegations regarding Feldman, which are, to me, off the deep end of advocacy by any standard, accusing the government of an atrocity of racism, vile anti-Semitism, extreme anti-Semitic memes, these are extraordinary allegations and they are utterly false. They are a disgrace. They are unfair to Mr. Gregory, one of the most distinguished prosecutors in the Southern Atlantic. I clerked for a distinguished judge of this court. There is no foundation in the record for those allegations, none whatsoever, none. And I would ask the court- I have two asks. One is, of course, to affirm the conviction in this case, but I would ask that you go further as a matter of fairness and state in whatever opinion you do render that those allegations are unfounded and unsupported by the record. So I appreciate the court's indulgence in that. It's not a path I would usually take in argument, but the record needs to be clear. It's outrageous. Those kind of arguments would never be countenanced from a prosecutor on this kind of record, and they shouldn't be, no matter who makes them. There shouldn't be a different standard simply for defense advocacy. So if the court has no further questions, I'll rest on our briefs. Okay. Thank you, Judge. Thank you, Mr. Shipley. Mr. Klee. So I gather from that that if the court does grant me a new trial, there'll be 20 references to Fagan at the next trial, and that's just wonderful. That's just wonderful. There's no basis for Fagan being the most vile reference to Jews in the English language, in the English literature. That's the government's argument. There's no basis for it. If citation after citation, some of the most distinguished scholars in the United States and around the world have pointed this out over the years. I had no intention of raising this issue, but to the future, as if anti-Semitism and anti-Semitic violence is not a problem in this country, as if Jews don't feel what other people do not feel when they go into various communities in this country. I'm not Jewish, but I have some familiarity with it. To complain about it, to ask that it not be done, that's the outrage. I had no intention of in any way besmirching anybody, and it may well be complete ignorance that led it to occur. But it should not happen again, and it should not be complained about when it's pointed out. The point that drives this case is not whether there was error. There was error in this case. There was not a single theory of money laundering. There was a conspiracy to actually launder money, and there was a conspiracy to take money and send it overseas to pay back investors. The real question, though, was there, the charge is not the underlying money laundering. The charge is the conspiracy to commit it, and if it's charged as a single offense with two different objects, that does seem to be a situation where there's not a double jeopardy problem. Judge, I've read each of those cases, and in each of them, the distinction is whether it's basically its means. The next distinction is, does the court tell them, look, you only have to find one means. We're only looking for one means here. Judge, in this case, made it very clear to them, look, there's different offenses here, different consequences. One is a laundering offense. One, as I've explained to you, is not really a laundering offense. Promotion, right. And so, it was, in every way possible, every one of those cases, including the opinion by Justice White supports us in Chico's, clearly supports us because of the way it points out the distinction. Do you find, I've never seen that before, where there's an opinion from the Supreme Court where they're dismissing cert as improvidently granted their dissents, and with that opinion accompanying it. My brother, Newsom, may be more familiar with it than me, but so . . . I had that happen to me in a case called Rogers. Yeah? Okay. It's precedential, you think? I'm not sure. I'm not sure. I'm not sure. The point about the sufficiency, and again, it goes beyond this case . . . I don't think I want to tell the Supreme Court it's not. Your Honor, and I have had arguments in sufficiency cases. I have had an argument in front of Your Honor on sufficiency cases before, and I'm not sure that our view of sufficiency is the same. For me, I have a very high standard for sufficiency. To me, the word substantial, I place a very high value on it, and I think that word in and of itself is one of the great things. I've been charged with this. I'm actually a small business prosecution. They're trying to get people too drunk to know what they're doing, not by selling 160 proof tequila, but champagne. The very notion of this conspiracy is that you're going to get people so drunk by drinking champagne that they're not going to know what they're doing, and you come up with the government now on their argument says, well, there were two instances where we have somebody saying, I recall some unknown person, some unnamed person, nobody names anybody, and I tried to switch a bottle on him. Was Feldman there? Was Feldman aware of it? Did anybody tell him? No. Did you get away with it? No. Did it happen? No. Even as to those people, we don't know whether it's lost. We don't know whether a single person in this case was overcharged. So you have a small business guy. He invests in this company. Simchick comes in and he'll say the worst things in the world. He'll make the I saw Feldman. I had a conversation with Feldman. I told him we're doing this and we're doing this and we're doing this in this bar because Simchick said he wanted to skate above the line. That's why he didn't do forgeries. And this one random reference that is very vague about were there bottles ever ordered is not substantial because it doesn't match the video. It doesn't match King. It doesn't match the case. Thank you, Mr. Kluge. I know you were court appointed. No, no, you weren't. Pro bono. Oh, well, thank you anyway. Romani versus Scott.